Rose Daly-Rooney, AZ Bar #015690
Maya Abela, AZ Bar #027232
Tamaraingsey In, AZ Bar #035208
Meaghan Kramer, AZ Bar #029043
ARIZONA CENTER FOR DISABILITY LAW
5025 E. Washington Street, Suite 202
Phoenix, AZ 85034
(602) 274-6287
E-mail: rdalyrooney@azdisabilitylaw.org
        mabela@azdisabilitylaw.org
        sin@azdisabilitylaw.org
        mkramer@azdisabilitylaw.org

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Kathleen Hoffard,<br><br>                    Plaintiff,<br><br>          vs.<br><br>Cochise County, Arizona; Lisa Marra, in her official capacity as Director of Cochise County Elections Department,<br><br>                    Defendants. | Case Number: 4:20-cv-00243-SHR<br><br>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING**<br><br>*(Assigned to the Hon. Scott H. Rash)* |

Plaintiff, by and through counsel, respectfully moves the Court to enter a Preliminary Injunction under Fed. R. Civ. P. 65 ordering Defendants to make a reasonable modification to their policy of a blanket ban on curbside voting during in-person voting, or provide a substantially equivalent reasonable modification, at Defendants' Vote Centers for the November 2020 General Election. This Motion is supported by Plaintiff's declaration and a Memorandum of Law of Points and Authorities.

In support of her Motion, Plaintiff states:

1.       Plaintiff has rheumatoid arthritis and takes medication that suppresses her immune system. She is a registered voter in Cochise County who desires to cast a vote in-person using curbside voting or a substantially equivalent reasonable modification, on

Election Day at one of Defendants' Vote Centers in the November 2020 General Election. *See* Declaration of Kathleen Hoffard at ¶¶ 1, 13-15, Exhibit 1 ("Hoffard Decl.").

2.     Plaintiff is likely to succeed on the merits of her claims under the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and the Arizona Civil Rights Act ("ACRA"), because Defendants discriminate against her and other voters based on disability in their refusal to provide curbside voting, or a substantially equivalent reasonable modification, for qualified individuals with disabilities who wish to participate in in-person voting on Election Day.

3.     Absent a preliminary injunction, Plaintiff and other voters with disabilities will suffer irreparable harm in the 2020 General Election. Specifically, Plaintiff will be forced to navigate the parking lot and Vote Center despite significant pain in walking, standing and, unlike in prior years, the absence of a preliminary injunction forces Plaintiff to risk exposure to COVID-19 at a County Vote Center to exercise her right to cast a ballot by in-person voting. Hoffard Decl. at ¶ 13-15.

4.     The balance of equities supporting the grant of preliminary injunctive relief tips in favor of Plaintiff. In the absence of a preliminary injunction, Plaintiff and other voters whose disabilities place them at greater risk of serious health complications or death from COVID-19 will suffer injury to their right to equal access to voting on Election Day when there are rapidly deployable, free or limited cost ways to provide curbside voting as a reasonable modification for qualified individuals with disabilities.

5.     The public interest is in upholding the right of Plaintiff and other voters with disabilities to have equal access to the in-person voting process, especially considering the ongoing COVID-19 pandemic.

6.     On October 1 and October 5, 2020, Plaintiffs, through counsel, conferred with Defendants' counsel to try and avoid the need to request a Preliminary Injunction. Defendants have not agreed to Plaintiff's request to provide curbside voting, or a substantially equivalent reasonable modification, during the upcoming General Election

on November 3, 2020. *See* Declaration of Rose Daly-Rooney at ¶¶ 9-10, Exhibit 2 ("Daly-Rooney Decl.")

## MEMORANDUM OF POINTS OF AUTHORITIES

### INTRODUCTION

Curbside voting is offered at polling places across America as a reasonable modification for voters with disabilities, allowing them the opportunity to vote in person like their peers. This modification is especially important for voters whose physical disabilities or immune system deficiencies make it painful, dangerous, or impossible to safely enter their polling places to vote. During the COVID-19 pandemic, it is more important than ever that jurisdictions provide the reasonable modifications necessary to ensure equal access to in-person voting for people with disabilities, including curbside voting.

In Cochise County, Arizona, voters with disabilities who want to vote at the polls but are unable to safely enter Vote Centers to do so, do not have the option of voting curbside and face imminent disenfranchisement. Since 2017,[1] Cochise County's blanket ban on curbside voting has prevented voters with disabilities like Hoffard from being able to safely vote in person, in violation of the ADA, 42 U.S.C. § 12131 *et seq*.; Section 504, 29 U.S.C. § 794; and ACRA, A.R.S. § 41-1421(B). Defendants' blanket ban eliminates a recognized reasonable modification that many individuals with disabilities may need in order to have equal access to the in-person voting process to exercise their constitutional right to vote.

For the reasons set forth herein, Hoffard is entitled to a preliminary injunction enjoining Cochise County's curbside voting ban because: (1) she is likely to succeed on

---

[1] Cochise County implemented its ban on curbside voting on June 19, 2017, an election off year where the only election conducted after the ban involved a school district override *See* Cochise County, *Previous Election Results* https://www.cochise.az.gov/elections/previous-election-results (last visited Sept. 9, 2020). In 2018, Hoffard became aware of the ban when she requested curbside voting to vote in the 2018 Mid-Term Election. Hoffard Decl. at ¶ 6.

the merits, (2) she will suffer irreparable harm in the absence of an injunction, (3) an injunction is in the public interest, and (4) the balance of equities tips in her favor.

## FACTS

### A. Plaintiff Desires a Reasonable Modification to Vote in Person.

Hoffard is an individual living with severe physical disabilities. Hoffard Decl. at ¶ 2. She has spinal stenosis (lumbar and cervical spondylosis), rheumatoid arthritis, osteoarthritis, spondylolisthesis of the lumbar region, and degenerative disc disease.[2] *Id.* at ¶ 2-3. As a result of these conditions, Hoffard is substantially limited in the major life activities of standing, walking, and musculoskeletal function. *Id.* at ¶ 2. Hoffard also experiences numbness throughout her body and problems balancing because of these disabilities. *Id.* at ¶ 5. She always uses a cane as an assistive device outside her home and a walker when extensive walking is required. *Id*. But walking even short distances can cause Hoffard great pain and physical distress because of these disabilities. *Id.* at ¶ 4. Hoffard also takes medication to manage her rheumatoid arthritis which suppresses her immune system. *Id.* at ¶ 3. As a result, Hoffard is also is substantially limited in the major life activity of immune system function. *Id*. This may also place her at higher risk of severe illness from COVID-19, the disease caused by the novel coronavirus SARS-CoV-2. *Id*.

As a result of her disabilities, Hoffard seeks curbside voting, or a substantially equivalent reasonable modification, to have equal access to vote in person. *Id.* at ¶ 13-15. Due to her disabilities, Hoffard participated in curbside voting in Cochise County in elections for years prior to the 2018 Mid-Term Election. *Id.* at ¶ 6.

A Mid-Term Election was held across the United States, and in Cochise County, on November 6, 2018. On that day, Hoffard went to the Vote Center located at the United Methodist Church at 3225 St. Andrews Dr., Sierra Vista, AZ 85650, to vote. *Id.* at ¶ 7.

---

[2] At the time of the 2018 election, Hoffard also experienced drop foot. Hoffard Decl. at ¶ 11.

When Hoffard arrived, she was told by a poll worker that curbside voting was not available at that location. *Id.* She then phoned the Cochise County Elections Department and spoke with an employee named Ross Romero. *Id.* at ¶ 8. She was told by Mr. Romero that curbside voting would not be available at any polling location in Cochise County because all the vote centers in the County were compliant with the Americans with Disabilities Act. *Id.* Finally, Hoffard went to a second Vote Center, Shiloh Christian Ministries, located at 1519 S. Ave. Del Sol, Sierra Vista, AZ 85635, to vote. *Id.* at ¶ 9. Hoffard was told in-person by a poll worker there that curbside voting was not available at that location. *Id.* No other reasonable modifications were offered to her by Mr. Romero or any of the Vote Center poll workers. *Id.* at ¶¶ 7-9.

After also being informed by poll workers at the Shiloh Christian Ministries Vote Center that curbside voting was not available, Hoffard was faced with the choice of being disenfranchised or struggling to exit her vehicle and navigate to the polling location in order to vote. Hoffard chose the latter. *Id.* at ¶ 10.

Hoffard experienced great physical pain and fatigue while using her walker to walk from the parking space where she parked her car to the entrance of the polling location, and through the polling location to the polling booth. *Id.* at ¶ 11. Due to disability-related pain, fatigue, and balance concerns, she had to stop for several breaks to rest. *Id.* Hoffard also had to navigate pavement in the parking lot of the polling location that was difficult to walk on due to disabilities, and an interior of the polling location filled with small area rugs, which posed trip hazards for her as she navigated over them in her walker. *Id.* While Hoffard managed to eventually cast her ballot on November 6, 2018, she did so despite great difficulty and pain she experienced throughout the in-person voting process in the absence of a reasonable modification for curbside voting. *Id.* at ¶ 12.

Hoffard requires a reasonable modification that allows her to vote in person without having to exit her vehicle or navigate the parking lot and polling location, as this causes Hoffard significant difficulty and pain due to her disabilities. *Id.* at ¶ 13. Hoffard plans to vote in person in all upcoming elections in Cochise County, including the general

election scheduled for November 3, 2020. *Id.* at ¶ 14. Hoffard believes in the tradition of voting in-person on Election Day and wishes to cast her vote this way. *Id.* at ¶ 16. To Hoffard, voting in any other format would not feel the same. *Id.* In addition to the other reasons associated with her disabilities, based on current medical knowledge, Hoffard also needs the reasonable modification to avoid an increased risk of contracting COVID-19 due to her status as a person with suppressed immune function. *Id.* at ¶ 14.

**B.  Cochise County's Blanket Ban on Curbside Voting.**

Although Defendants previously provided curbside voting for people with disabilities, in 2017, they instituted a blanket ban on curbside voting, thus eliminating a reasonable modification for people with disabilities who are unable to enter or navigate Vote Centers on Election Day. Cochise County included the following statement in its "Poll worker's Training Handbook" for the 2020 Presidential Preference Election, published on the County's public website:

> CURBSIDE VOTING (County Policy effective 2017): Curbside voting is allowed when a Vote Center is not ADA accessible. ALL 17 VOTE CENTERS IN COCHISE COUNTY ARE ADA ACCESSIBLE PER FEDERAL GUIDELINES. **CURBSIDE VOTING IS NO LONGER OFFERED** as an additional service.

Cochise County "Poll worker's Training Handbook" for the 2020 Presidential Preference Election at 27 [3], available at https://www.cochise.az.gov/sites/default/files/elections/PPEPollWorkerHandbook_Final.pdf (2020 PPE Handbook) (last visited Oct. 4, 2020) (emphasis in original).

The Cochise County public website also includes the following statement concerning curbside voting: "All vote centers in use in Cochise County are fully ADA compliant under Federal law. As such, disabled voters are welcome into the polling locations to cast their vote and curbside voting is not required. Because there are no pre-printed paper ballots at our vote centers, all voters are required to vote on the electronic

---

[3] Page numbers for this document refer to the PDF page numbers, not the printed page numbers, which are not consecutive.

machines which are not able to be moved outside, or to the curb, due to the sensitive computer equipment inside the machines." *Cochise County Arizona: Elections FAQs – I'm disabled – how can I vote?*, available at: https://www.cochise.az.gov/elections/elections-faqs (last visited Oct. 4, 2020).

Cochise County also states that curbside voting cannot be offered "because of potential injury to Voters, Poll workers, and equipment" and because the number of ballot styles would make in difficult to have paper ballots on hand. *See.* 2020 PPE Handbook at 27.

### C. If Necessary, Commercially Available, Low Cost Options Exist to Provide Curbside Voting as a Reasonable Modification.

There is equipment to transport voting machines or alternatively, to print paper ballots, that is commercially available at moderate to minimal cost. Carts specifically designed to make it even easier to move voting machines for curbside voting are commercially available.[4] *See* PeakLogix CurbExpress™ by ReadyVote®, https://www.peaklogix.com/products/curbside-voting/ (last visited Oct. 4, 2020). According to the manufacturer, this cart is designed to be compatible with the ExpressVote ballot marking device that Cochise County (and many other Arizona counties) use as accessible voting machines at all its Vote Centers. It is designed for the ExpressVote machine to be able to be fastened to the cart with screws, in order to ensure it is secure, and is also designed to be able to traverse all types of terrain (grass, gravel, snow, sand, etc.) and be easily maneuvered by a single poll worker. *See* Daly-Rooney Decl. at ¶ 4. The base rate for this cart is $615 per unit and is available with add-on accessories to shield the device from the elements for $795 per unit. *Id.* at ¶ 5. Additionally, ballot printers can be used to print paper ballots at Vote Centers, which would allow voters who need to vote curbside to vote the appropriate paper ballot from their vehicle. *See, e.g.,* Election Systems and

---

[4] In addition to the availability of carts, it must be noted that the ExpressVote machines that Cochise County uses are, according to the manufacturer, "small, lightweight and easy to move." *See* ExpressVote One-Sheet at 2, available at https://www.essvote.com/wp-content/uploads/2020/09/ExpressVote-Marker_One-Sheet.pdf (last visited Oct. 4, 2020).

Software, *Ballot on Demand® Solution,* https://www.essvote.com/products/ballot-on-demand/ (last visited Oct. 4, 2020).

Other Arizona counties, which use the same electronic voting equipment as Cochise County, also provide curbside voting.[5] Other jurisdictions across the country also use the same voting equipment that Cochise County uses to provide Election Day curbside voting.[6]

### C. The COVID-19 Pandemic Makes Voting in Person More Risky.

The COVID-19 pandemic has altered the lives of Arizonans, particularly Arizonans with disabilities. On March 11, 2020 Governor Ducey declared a State of Emergency for the State of Arizona, and the Arizona Department of Health Services ("ADHS") urged citizens to take extra precautions to keep the spread of the virus at a minimum. Among these recommendations is to avoid close contact with others and to wear masks in public. ADHS, *What Everyone Needs to Do*, https://azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/index.php#novel-coronavirus-what-everyone-needs (last visited Oct. 4, 2020).

The United States Centers for Disease Control and Prevention ("CDC") published a list of "certain underlying medical conditions" that place an individual at an increased risk of severe illness if an individual contracted the virus. These conditions include: cancer, chronic kidney disease, chronic obstructive pulmonary disease, immunocompromised state from organ transplant, obesity, serious heart conditions, sickle

---

[5] *See, e.g.,* Pinal County, *Voters with Disabilities*, available at https://www.pinalcountyaz.gov/elections/pages/voterswithdisabilities.aspx (last visited Oct. 4, 2020); Santa Cruz County, *Voters with Disabilities*, available at https://www.santacruzcountyaz.gov/693/Voters-with-Disabilities (last visited Oct. 4, 2020). For a list of counties and election software currently in use, *see* Arizona Secretary of State, *2020 Election Cycle / Voting Equipment*, available at https://azsos.gov/sites/default/files/2020_0709_Election_Cycle_Voting_Equipment.pdf (last visited Oct. 4, 2020).

[6] *See, e.g.,* Dallas County Elections Department, *What is Curbside Voting?*, available at https://www.dallascountyvotes.org/election-day-voting/ (last visited Oct. 5, 2020) ("Poll worker will take the designated Express Vote device to the voter's vehicle").

cell disease, and type 2 diabetes. CDC, *People with Certain Medical Condition*s (updated Aug. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/ people-with-medical-conditions.html (last visited Oct. 4, 2020). According to the CDC, based on current data and information about the impact of underlying medical conditions and whether they increase the risk for severe illness from COVID-19, people with the following conditions might be at an increased risk for severe illness from COVID-19: asthma (moderate-to-severe), cerebrovascular disease (affects blood vessels and blood supply to the brain), cystic fibrosis, hypertension or high blood pressure, immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines, neurologic conditions, liver disease, pregnancy, pulmonary fibrosis, smoking, thalassemia (a type of blood disorder), and Type 1 diabetes mellitus. *Id.*

The rates of COVID-19 are predicted to rise in the coming months as we approach the General Election on November 3, 2020. Most prediction-models, including an influential model designed and used by the Institute for Health Metrics and Evaluation at the University of Washington, predict "a catastrophic winter with a significant rise in coronavirus deaths." *See, e.g*., Amir Vera et al., *US Could See a 'Very Deadly December' with Tens of Thousands of Coronavirus Death [sic] to Come, Computer Model Predicts*, CNN.com, Sept. 11, 2020, available at https://www.cnn.com/2020/09/11/health/us-coronavirus-friday/index.html (last visited Oct. 4, 2020).

**D. State and Federal Guidance Encourages Curbside Voting During The COVID-19 Pandemic.**

Both state and federal guidance for voting during the COVID-19 pandemic encourage the use of curbside voting to promote appropriate social distancing and allow for increased safety during in-person voting. The CDC has recommended alternatives to voting inside polling locations, including curbside voting, so that voters can exercise their rights while avoiding group settings. CDC, *Considerations for Election Polling Locations and Voters* (June 22, 2020)*,* https://www.cdc.gov/coronavirus/2019-ncov/community/

election-polling-locations.html (last visited Oct. 4, 2020). The Office of Secretary of State Katie Hobbs, who is the Chief Election Official in Arizona, issued a press release on March 11, 2020, concerning response to COVID-19 for election officials. The press release stated the following: "According to health experts and the governor's recent executive order, Arizona's elderly population and those with underlying health conditions are most at risk of serious illness from COVID-19." *See* Arizona Secretary of State, Press Release, March 11, 2020, available at https://azsos.gov/about-office/media-center/press-releases/1116 (last visited Oct. 4, 2020). Secretary Hobbs encourages curbside voting as an alternative means of voting: "Provide curbside voting whenever possible and ensure adequate signage and instructions so voters can request the accommodation from the parking lot." Secretary of State - Arizona Dot Vote, *Guidance for Reducing COVID-19 Risks at In-Person Voting Locations*, available at https://azsos.gov/sites/default/files/AZSOS_Polling_Place_Guidance_2020.pdf (last visited Oct. 4, 2020); *see also* Secretary of State of Arizona, *Voting in this Election – Curbside Voting*, available at https://azsos.gov/elections/voting-election (last visited Oct. 4, 2020) ("Voters who are unable to enter the polling location or voting center may ask that a ballot be brought to them by an election poll worker").

National guidance has also been issued on keeping voters safe from COVID-19 during the in-person voting process: "[c]onsider expanding curbside or "drive-thru" voting options to maintain social distancing and offer access to voters with disabilities." U.S. Elections Assistance Commission, *Preparing for In-Person Voting During COVID-19: Voting Location Requirements*, available at https://www.eac.gov/sites/default/files/document_library/files/In-Person%20Voting%20-%20Building%20Requirements%20%28004%29.pdf (last visited Oct. 5, 2020). Despite this guidance, in-person voting, as with all in-person activities, still comes with risks. Aerosols that are emitted by someone who is infected with COVID-19 can remain in the air for hours. Harvard Health Publishing, *Coronavirus*

*Resource Center* (updated Oct. 2, 2020) https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center (last visited Oct. 4, 2020).

## ARGUMENT

I. **A PRELIMINARY INJUNCTION SHOULD BE ISSUED TO ENSURE PLAINTIFF CAN CAST A BALLOT IN-PERSON ON ELECTION DAY DURING THE NOVEMBER 2020 GENERAL ELECTION**

A party seeking a preliminary injunction must demonstrate that: (1) she is likely to succeed on the merits; (2) she will suffer irreparable harm in the absence of an injunction; (3) an injunction is in the public interest; and (4) the balance of equities tips in her favor. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiff demonstrates all these factors, and a preliminary injunction should be issued directing Defendants to make an exception to their blanket ban on curbside voting as a reasonable modification to allow Hoffard to vote in person on Election Day.

A. **Plaintiff is Likely to Succeed on Federal and State Civil Rights Claims that Require Defendants to Provide a Reasonable Modification for Her to Cast an In-Person Ballot.**

Title II of the ADA, Section 504, and ACRA prohibit covered entities from discriminating against people with disabilities:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130(a) (ADA); 29 U.S.C. § 794(a) (Section 504); A.R.S. § 41-1421(B) (ACRA).[7] Public entities also may not, on the basis of

---

[7] Claims under Section 504 of the Rehabilitation Act, 29 U.S.C. §794 *et. seq.*, against federally funded entities, are generally given the same analysis as claims under the ADA. *See Duvall v. County of Kitsap*, 260 F.3d 1124, 1136 (9th Cir. 2001). Similarly, claims under ACRA, A.R.S. § 41-1421, are given the same analysis as the ADA. *See* A.R.S. § 41-1421(D) ("[c]ompliance with title II of the Americans with disabilities act [sic] (42 United States Code §§ 12131 through 12134) and its implementing regulations and the voter accessibility for the elderly and handicapped act [sic] (42 United States Code §§ 1977ee through 1977ee-6) is deemed in compliance with this article"). Therefore, arguments about Plaintiff's claims under the ADA, Section 504, and ACRA are consolidated. Statutory and rule citations are provided for each statute.

disability, afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others. 28 C.F.R. § 35.130(b)(1)(ii) (ADA); 11 C.F.R. § 9420.3(b)(1)(ii) (Section 504). The ADA applies to state and local government entities and protects qualified individuals with disabilities from discrimination based on disability in services, programs, and activities provided by local government entities. 42 U.S.C. §§ 12131-12132. Defendants are subject to Section 504 because they operate a "program or activity" receiving Federal financial assistance, which is defined to include "all the operations of a department, agency . . . or other instrumentality of local government." 29 U.S.C. § 794(b). Defendant Cochise County receives federal funds administered by the U.S. Election Assistance Commission. 11 C.F.R. § 9420.3.[8]

The ADA and Section 504 provide for broad coverage extending to "anything a public entity does." *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014); *see also Johnson v. City of Saline,* 151 F.3d 564, 569 (6th Cir. 1998) (finding that "the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does").[9] The ADA and Section 504 apply to all the Defendants' voting services, programs,

---

[8] The federal government distributes funds to help local officials to improve election security and administration. Federal funds are distributed via, among other programs, the Help America Vote Act of 2002, § 302, 42 U.S.C. § 15482 ("HAVA"). Congress authorized funding for the 2018 HAVA Election Security grant, pursuant to the Consolidated Appropriations Act, 2018 (Public Law 115-141). The State of Arizona was awarded $7,463,675 with a state match share of $373,184. *See 2018 HAVA Election Security Sub-Grant Guidelines* at 2, available at https://destinyhosted.com/cochidocs/2020/BOS/20200107_1806/4933_2018%20HAVA%20Sub-Grant%20Guidelines.pdf (last visited Oct. 5, 2020). Cochise County was awarded $143,184.40 by the Arizona Secretary of State. *Id.* at 7. The Consolidated Appropriations Act, 2020 included $425 million in new HAVA funds that have been distributed to state election offices by the U.S. Election Assistance Commission. *See* U.S. Election Assistance Commission, *Election Security Funds*, available at https://www.eac.gov/payments-and-grants/election-security-funds (last visited Oct. 5, 2020)

[9] While the covered "services, programs, and activities" of public entities are not defined in the ADA, the ADA was modeled on the Rehabilitation Act of 1973, which prohibited any "program or activity" that received federal funds from discriminating against individuals with disabilities. 29 U.S.C. § 794(a); *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1216 n. 27 (9th Cir. 2008). The

or activities, including *in-person voting* at the County's Vote Centers. *See Crawford v. Marion County Election Bd.* 553 U.S. 181 n. 4 (2008) ("It is one thing (and a commendable thing) for the State to make [alternatives to in-person voting] available to the elderly and disabled; but it is quite another to suggest that, because the more convenient but less reliable [alternative] is available, the State may freely deprive the elderly and disabled of the option of voting in person."); *People First of Alabama, et al. v. Merrill,* 2:20-CV-00619-AKK, 2020 WL 3207824 at *26 n. 46 (N.D. Ala. June 15, 2020), appeal dismissed, 20-12184-GG, 2020 WL 5543717 (11th Cir. July 17, 2020) ("The ADA is not so narrow that the plaintiffs' rights only extend to voting at some time and in some way.")  (internal citations omitted); *see also* U.S. Dep't of Justice, ADA Checklist for Polling Places (June 2016) ("ADA Checklist"), available at https://www.ada.gov/votingchecklist.pdf (last visited Oct. 4, 2020). Voting at one's polling place "allows voters the chance to interact with neighbors and candidates who talk with voters outside the polling place, and to ask questions of or receive assistance from trained poll workers inside the polling place." *See* ADA Checklist. "[V]oting in person at a local polling place is the quintessential American voting experience." *Id.*

Successful claims under the ADA, Section 504, and ACRA consist of showing the following elements: (1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002) (per curiam).

---

Rehabilitation Act defines "program or activity" as "*all of the operations of* . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b) (emphasis added). Congress instructed that the ADA is to be interpreted consistently with the Rehabilitation Act. *See Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**1.  Plaintiff is an individual with a disability who is qualified to vote.**

Hoffard is a "qualified individual with a disability" which is defined as:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2) (ADA); 11 C.F.R. § 9420.2 (Section 504); A.R.S. § 41-1421(E)(1)-(2) (ACRA). Hoffard's physical impairments substantially limit the major life activities of walking, standing, immune system function, and musculoskeletal function. Hoffard Decl. at ¶¶ 2-3. Accordingly, she is an individual with a disability as defined by the ADA, Section 504, and ACRA. 42 U.S.C. § 12102(1)-(2); 29 C.F.R. § 1630.2(i)(1)(ii) (adding musculoskeletal function as a major life activity); 29 U.S.C. § 705(9) (incorporating ADA's definition of disability); A.R.S. § 41-1421(E)(1)(a).   Hoffard is also a duly qualified and registered elector in Cochise County, and is therefore qualified to vote in the general election. 28 C.F.R. § 41.32(b); 11 C.F.R. § 9420; A.R.S. § 41-1421(E)(2). Accordingly, she is a qualified individual with a disability. 42 U.S.C. § 12131(2).

**2**. **The County discriminates against Hoffard by denying a reasonable modification of curbside voting to allow meaningful access to the County's in person voting.**

Defendants must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i) (ADA); 11 C.F.R. § 9420.2 (Section 504); A.R.S. § 41-1421(C) (ACRA); *see Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010) ("An organization . . . violates § 504 if it denies a qualified individual with a disability a reasonable accommodation that the individual needs in order to enjoy meaningful access to the benefits of public services"); *McGary v. City of Portland*, 386 F.3d 1259, 1267 (9th Cir. 2004) (failing to provide a reasonable accommodation is a form of discrimination under

14

the ADA); *cf Fortyune v. Am. Multi–Cinema, Inc*., 364 F.3d 1075, 1086 (9th Cir. 2004) ("[T]he ADA defines discrimination as a public accommodation treating a disabled patron the same as other patrons despite the former's need for a reasonable modification") (interpreting identical reasonable modification requirement under the ADA's Title III).

For example, in *Crowder v. Kitagawa*, a class of individuals with visual disabilities who used guide dogs brought suit to challenge Hawaii's rabies quarantine rules, which required all carnivorous animals, including dogs, to quarantine for 120 days upon entry to Hawaii. The court found that without reasonable modification of the administrative rule, the rule discriminated against people with disabilities by denying them meaningful access to state services, in violation of the ADA. 81 F.3d 1480 (9th Cir. 1996). "When a state's policies, practices or procedures discriminate against the disabled in violation of the ADA, Department of Justice regulations require reasonable modifications in such policies, practices or procedures 'when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.'" *Id.* at 1485.

Unlike the 120-day quarantine rule in *Crowder*, Defendants' policy of banning all curbside voting is per se unlawful on its face because it prevents an individualized assessment of whether curbside voting is a reasonable and necessary modification based on a voter's disability-related need. *Id.; Cf. McGregor v. Nat'l R.R. Passenger Corp*., 187 F.3d 1113, 1116 (9th Cir. 1999) (holding that a policy requiring an employee to be "100% healed" before returning to work does not allow a case-by-case assessment of an individual's ability to perform essential functions of the individual's job, with or without accommodation) (Title I ADA). Under the ADA, Plaintiff only must show that Defendants failed to make a requested reasonable modification that was necessary to accommodate her disability. *Fortyune,* 364 F.3d at 1085.

Hoffard requested a *reasonable* modification. Curbside voting is a reasonable modification to provide a meaningful opportunity to vote in person at a Vote Center on

Election Day. Reasonableness "depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to [enjoy meaningful access to the program.]" *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (internal citation and quotation marks omitted).  Here, curbside voting can be provided by transporting the voting machine to the voter's parked vehicle or making a paper ballot available and bringing it to the voter's car.  The voting machine the County uses is already designed to be easy to move, and there is a commercially available cart designed for the same machine that can be purchased to make it even easier for the voting machine to be pushed to the vehicle. There are also ballot printers that can be used to print ballots that could be handed to voters requiring curbside voting as a reasonable modification. Other Arizona counties using the same voting machines offer curbside voting for those voters who need it.

        Providing curbside voting is necessary for Hoffard to cast her vote in person on Election Day. Although Hoffard can walk, she experiences significant pain and fatigue when walking and standing. Hoffard Decl. at ¶¶ 4, 13, 15. To traverse the distance from the parking space to the building entrance and to the voting machine as well as standing or sitting while waiting will involve pain and fatigue. *Id.* Additionally, to treat an underlying physical disability, she is prescribed Methotrexate, which produces the adverse side effect of weakening her body's own immune response. *Id.* at ¶ 3. Because of the predicted rise of COVID-19 in the coming months as we approach the General Election on November 3, 2020, she will be taking significant risk to enter the Vote Center to cast her ballot. *Id.* at ¶ 14.

        Defendants cannot show that making exceptions to the ban on curbside voting as a reasonable modification would be a fundamental alteration of in-person voting. Defendants made a policy decision to discontinue curbside voting as a method of providing program access at is Vote Centers for people with disabilities in favor of removing architectural barriers at the Vote Centers. However, compliance with the affirmative obligation to offer program access in existing facilities under 28 C.F.R. §

35.150 (ADA) [11 C.F.R. § 9420.5 (Section 504), and A.R.S. § 41-1421(D) (ACRA], and to design and construct new or altered facilities in compliance with accessibility standards under 28 C.F.R. § 35.151 (ADA) [11 C.F.R. § 9420.6 (Section 504), and A.R.S. § 41-1421(D) (ACRA)] does not relieve a public entity of its obligation to comply with other ADA regulations, such as reasonable modifications to rules and practices under 28 C.F.R. § 35.130(b)(7) (ADA) [11 C.F.R. § 9420.2 (Section 504), and A.R.S. § 41-1421(C) (ACRA)]. While covered entities may chose the methods to provide program access in existing facilities (e.g. provide structural changes or offer rolling stock or alternative accessible locations for services)[10], they may not choose whether to comply with the reasonable modification regulation. *Cf. Anderson v. City of Blue Ash*, 798 F.3d 338, 363 (6th Cir. 2015) ("Requiring public entities to make exceptions to their rules and zoning policies is exactly what the [Fair Housing Amendments Act] does. The fact that the City banned horses from residential property does not mean that any modification permitting a horse necessarily amounts to a fundamental alteration"). Otherwise, covered entities could justify denying a voter the right to bring their service animal into a Vote Center or to provide a sign language interpreter to a voter who was deaf in a discussion about how to fill out their voter registration paperwork on the grounds their facility was physically accessible. *Cf. Fortyune*, 364 F.3d at 1085 (rejecting Defendant's insistence that the ADA's accessibility guidelines controlled in a reasonable modification claim about a policy regarding the use of availability of companion seating).

Furthermore, the ADA "guarantees the disabled more than mere access to public facilities; it guarantees them 'full and equal enjoyment.'" *See Baughman v. Walt Disney World Co.,* 685 F.3d 1131, 1135 (9th Cir. 2012) (public accommodations should consider

---

[10] Under 28 C.F.R. 35.150(b)(1), a public entity may comply with the requirements to provide program access through various methods, such as "redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities."

"how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience.") (interpreting identical reasonable modification requirement under Title III of the ADA). Under a "meaningful access" standard, an entity is "not required to produce the identical result . . . for handicapped and nonhandicapped persons," but they nevertheless "must afford handicapped persons equal opportunity to . . . gain the same benefit." *Argenyi v. Creighton Univ.*, 703 F.3d 441, 449 (8th Cir. 2013) (citation omitted).

Based on Defendants denial of a reasonable modification during the 2018 midterm elections, the blanket ban on curbside voting in Cochise County, and the County's failure to offer an alternative reasonable modification for in-person voting, Defendants discriminated against and continue to discriminate against Hoffard and other voters with disabilities with similar needs who will, without intervention form this Court, face discrimination in November 2020. Because Hoffard has shown that she needs curbside voting as a reasonable accommodation, or a substantially equivalent reasonable modification, for a meaningful opportunity to vote in person in the November 2020 General Election, she has made a sufficient showing of likelihood to prevail on the merits.

### B. Hoffard Will Suffer Irreparable Harm.

Courts routinely deem restrictions on fundamental voting rights as irreparable injuries. *See Jones v. Gov. of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020) (finding "plaintiffs will suffer an irreparable injury if they are precluded . . . from voting in an election in which they were constitutionally entitled to vote."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (affirming order granting preliminary injunction, reasoning "[a] restriction on the fundamental right to vote [] constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 330 (2d Cir. 1986) (same). Further, denial of the opportunity to cast a vote constitutes irreparable harm because monetary damages would not be an adequate remedy:

> Casting a vote has no monetary value. It is nothing other than the opportunity to participate in the collective decision making of a democratic society and to add one's own perspective to that of his or her fellow citizens. Each vote provides a unique opportunity to do that. No compensation a court can offer could undo that loss. The denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm.

*Jones*, 950 F.3d at 828 (affirming a district court's grant of a preliminary injunction).

Hoffard and other voters with disabilities recognized by the CDC to increase likelihood of serious harm from contracting COVID-19 will be placed at risk of irreparable harm if they are denied access to curbside voting, or a substantially equivalent reasonable modification, on Election Day. *See Thakker v. Doll*, 451 F. Supp. 3d 358, 372 (M.D. Penn. 2020) (granting plaintiffs' temporary restraining order, reasoning that irreparable harm was imminent as the global COVID-19 pandemic sweeps across the nation) (appeal filed); *Immigrant Legal Resource Center v. City of McFarland*, 1:20-CV-00966-TLN-AC, 2020 WL 4593886 at *10 (E.D. Cal. 2020) (finding a likelihood of irreparable harm because "COVID-19 poses a concrete threat to the public health"). On Election Day, Vote Centers will be filled with voters who will spend time inside the buildings checking in, waiting in line, and casting their votes. If required to enter the Vote Center to vote in person, Hoffard will have to be in proximity to other voters and poll workers, increasing her risk of contracting COVID-19. Additionally, Hoffard will experience significant pain related to walking, sitting, and standing as she checks in, waits in line, and casts her vote. Hoffard Decl. at ¶ 13-15. These physical barriers are significant for Hoffard, and place her in the position of having to risk her health and safety or give up her right to vote in person on Election Day. *Id.* at ¶ 14.

### C. Providing Reasonable Modifications for Participation in the County's In-Person Voting Program is in the Public Interest.

"The public interest ... favors permitting as many qualified voters to vote as possible." *Husted*, 697 F.3d at 437; *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (the public has a "strong interest in exercising the fundamental political right to vote") (citations omitted). Additionally, "upholding constitutional rights serves the public

interest." *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). Furthermore, in cases involving elections, "[t]he public interest is significantly affected." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003).

When determining public interest, it is also important to note that the government has an interest in protecting the health and safety of its citizens and preventing the further spread of COVID-19. *See National Association of Wheat Growers v. Zeise*, 309 F.Supp. 3d 842, 853 (E.D. Cal. 2018) (recognizing that the state has a significant interest in protecting its citizens and informing them of possible health risks); *Diretto v. Country Inn & Suites by Carlson*, 1:16CV1037, 2016 WL 4400498, at *4 (E.D. Va. Aug. 18, 2016) (there is a public interest in preventing the further spread of disease).

Moreover, society has a public interest in ensuring the rights of individuals with disabilities and preventing discrimination. *Newton-Nations, v. Rogers*, 316 F. Supp. 2d. 883, 889 (D. Ariz. 2004) ("Our society as a whole suffers when we neglect . . . the disabled, or when we deprive them of their rights or privileges.") (quoting *Lopez v., Heckler*, 713 F.2d 1432, 1437-38 (9th Cir. 1983)).  The public interest is not served when governmental policies violate federal law. *A. O. v. Cuccinelli*, 19-CV-06151-SVK, 2020 WL 2097586 at * 11 (N.D. Cal. 2020) (citing *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).

### D. The Balance of Equities Tips in Favor of Preliminary Relief.

To determine the balance of equities, the court must "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (citation omitted). Here, the balance of interests tip in favor of Hoffard. There is a strong public interest in protecting a voter's right to reasonable modifications during in-person voting, and the health of Cochise County voters with underlying medical conditions who choose to vote in person at one of the County's Vote Centers. Hoffard and other voters with disabilities in Cochise County face a lack of meaningful access under the ADA, Section 504, and ACRA, and the prospect of disenfranchisement if their physical disabilities become too burdensome, or if COVID-19 rates increase. There is no

immediate relief for a voter who is either unable to vote or required to vote under unsafe or painful conditions due to disability-related discrimination.  Hoffard and other voters with disabilities recognized by the CDC to increase likelihood of serious harm from contracting COVID-19 will be placed at risk if they chose to enter the Vote Centers if curbside voting is not made available.

On the other hand, if a preliminary injunction were to issue, Defendants would be required to abandon their local preference to rely exclusively on their obligation to remove architectural barriers and lift their ban against *all* curbside voting as necessary to provide reasonable modifications. An interest in ignoring the reasonable modification mandate under the ADA, Section 504, and ACRA should not tip the scale in Defendants' favor.  Allowing curbside voting as a reasonable accommodation, where necessary based on a voter's disability-related need, will require the County to take some steps for the upcoming election. These steps may include providing notice to voters that curbside voting is available as a reasonable modification and preparing Vote Center(s) for providing the reasonable modification, including (if the County decides not to move the voting machines without them) purchasing for carts to transport voting machines curbside, or ballot printers to produce ballots on demand and carry paper ballots to the voter's car, or other effective method of providing in person voting for the voters with disabilities that require such a reasonable modification.

## II.   THE COURT SHOULD NOT REQUIRE A BOND

Although the plain language of the Fed. R. Civ. P. 65(c) suggests that a bond is mandatory, the Ninth Circuit has held that it "invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation omitted). A district court need not require a bond "when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation omitted); *see also Bell S. Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) ("it is well-established that the amount of security required by

the rule is a matter within the discretion of the trial court…, and the court may elect to require no security at all") (citation omitted). Here, the Court should exercise its discretion to waive the bond requirement in this case, as there is no realistic likelihood that Defendants will be harmed as a result of an injunction that would cost little, if anything, to implement. Further, Hoffard's attorneys provide free legal services to individuals with disabilities in Arizona, including Hoffard, and a bond would strain limited financial resources for this work.

## CONCLUSION

For the foregoing reasons, Plaintiff Kathleen Hoffard respectfully requests that this Court issue a preliminary injunction, enjoining Defendants from implementing their blanket ban on curbside voting as set forth in the Proposed Order.

DATED this 5th day of October, 2020.

**ARIZONA CENTER FOR DISABILITY LAW**

*/s/ Tamaraingsey In*
Rose Daly-Rooney
Maya Abela
Tamaraingsey In
Meaghan Kramer
*Attorneys for Plaintiff Kathleen Hoffard*