BRIAN M. MCINTYRE
COCHISE COUNTY ATTORNEY
By: CHRISTINE J. ROBERTS
Chief Civil Deputy County Attorney
Arizona Bar No. 033718
P.O. Drawer CA
Bisbee, AZ 85603
(520) 432-8700
CVAttymeo@cochise.az.gov
*Attorney for Cochise County and Lisa Marra, in her official capacity as Cochise County Elections Director*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA, TUCSON DIVISION

| | |
|---|---|
| Kathleen Hoffard,<br>            Plaintiff,<br><br><br><br>    vs.<br><br>Cochise County, Arizona; Lisa Marra,<br>In her official capacity as Director of<br>Cochise County Elections Department,<br><br>            Defendants.<br>_____ | No. 4:20-CV-00243-SHR<br><br>**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING**<br><br><br>**Assigned to the Honorable Judge Scott H. Rash** |

   **COMES NOW** Defendants, Cochise County (the "County")  and Lisa Marra, in her official capacity as Director of Cochise County Elections (collectively "Defendants"), by and through undersigned counsel, hereby opposes and requests that this Court deny Plaintiff's Motion for Preliminary Injunction and Expedited Hearing under Fed. R. Civ. P., Rule 65, compelling the County to offer curbside voting, or a reasonable modification, at its Vote Centers for the November 2020 General Election.  Plaintiff is unlikely to

succeed on the merits and will not suffer irreparable harm if this extraordinary remedy of a mandatory injunction is denied, as discussed more fully below:

In support of Defendants' opposition, Defendants state:

1.      All of the County's seventeen (17) Vote Centers are fully ADA accessible and ADA compliant.  All equipment utilized at the Vote Centers is fully ADA accessible. (*See* Declaration of Lisa Marra ("Marra Decl."), ¶ 6).

2.      No pre-printed paper ballots are used at the seventeen (17) Vote Centers throughout the County because the specific ballot style can be accessed via the ExpressVote® machines.  Further, there are over 300-700 different ballot styles for each election, making it impossible and impracticable for the County to store paper copies of each ballot style at every one of its Vote Centers.  (*Id*., ¶ 8).

3.      The County does not have ballot on demand.  Nor does the County have any technology that would allow for specific, individualized ballots to be printed curbside. (*Id., ¶* 9).

4.      The County does not have the WIFI or internet capability and/or capacity to have reliable and consistent ballot on demand at its seventeen (17) Vote Centers throughout the mostly rural County.  (*Id*., ¶ 10).

5.      Electronic e-pollbooks that are used to capture voters' signatures cannot be disconnected from the Vote Centers' circuit to be taken curbside for a voter's signature because when it is disconnected from the system, the ***entire voting system*** shuts down and

has to be restarted before voting can resume, which can take up to twenty (20) minutes. (*Id.*, ¶ 11).

6.      Curbside voting is no longer offered because of the potential for injury to voters, poll workers and the voting machine equipment. (*Id.*, ¶ 12).

7.      The touchscreen ExpressVote® machines are very heavy and contain very sensitive components.  Even though they are all on portable stands, they are not designed to be moved in and out of the Vote Center facilities repeatedly for curbside voting and tend to tip over, which could cause damage to a disabled voter's vehicle or serious injury to a disabled voter or to the poll worker moving the ExpressVote® machine.  Simply stated, it is not safe for poll works to move these very top-heavy voting machines outside to a vehicle. (*Id.*, ¶ 15).

8.      Even though the PeakLogix CurbExpress ™ by ReadyVote® cart may be easier to move than the portable stands, the issue of the sensitive components remains unchanged.  Repeatedly moving the ExpressVote® machines causes technical problems with the machines.  Further, the carts will not always line up with the vehicles causing the disabled voter to get out of the vehicle to use the ExpressVote® machine. Additionally, the fact remains that the vast majority of the County's poll workers are elderly and these elderly poll workers would still be required to physically move the ExpressVote® machines, repeatedly, in and out of the Vote centers, creating the potential for the ExpressVote® machine and cart to tip over, damaging equipment and potentially injuring the poll worker and/or the vote. (*Id.*, ¶ 17).

9.      To date, the County Elections Department has had to have sixty-two (62) ExpressVote® machines repaired under the County's maintenance agreement, which costs the County approximately $22,000 per year.  All of these repairs resulted from routine movement for delivery, placement and pickup for use on Election Day.  (*Id*., ¶ 16)

10.      Since the implementation of the Vote Centers, the elimination of curbside voting, and over the course of eleven (11) Vote Center and nineteen (19) Vote by Mail elections and nearly 57,414 in-person voters, the County has only received two (2) complaints or concerns, inclusive of Ms. Hoffard's complaint, about the elimination of curbside voting. (*Id*., ¶ 3).

11.      On May 4, 2019, Ms. Hoffard filed a Complaint of Discrimination with the Arizona Attorney General's Office, Division of Civil Rights Section ("ACRD").  On May 4, 2020, ACRD closed its investigation and issued a dismissal notice finding that "the information obtained [was] not sufficient to establish violations of the statutes and that further investigation is unlikely to produce such evidence." On information and belief, Plaintiff requested that ACRD reopen the case.  However, ACRD did not reopen the case. (*Id.*, ¶¶ 32, 35-36).

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      **FACTUAL BACKGROUND**

In 2015, Cochise County (the "County") decided to move to Vote Centers, rather than assigned polling centers/places, and made a significant monetary investment of over $1 million dollars in touchscreen ExpressVote® machines to utilize for voting at the Vote

Centers.  (Declaration of Lisa Marra ("Marra Decl."), ¶ 2).  The County has utilized Vote Centers for its statewide elections, starting in 2016. (*Id*., ¶ 3).  Currently, Cochise County has seventeen (17) Vote Centers.  (*Id*., ¶ 4).  A Cochise County voter can go into any of the Vote Centers to cast his or her ballot, rather than having to go to an assigned precinct-based polling center or district. (*Id*., ¶ 5).  This makes it much more convenient for many voters, who reside in one location in the County but work in another location.  It also lessens the chance of voters' ballots being disqualified for voting in the wrong precinct.

All of the County's seventeen (17) Vote Centers are fully ADA accessible and ADA compliant. (*Id*., ¶ 6).  All equipment utilized at the Vote Centers is fully ADA accessible.  (*Id*.).  This was one important advantage and benefit of moving to Vote Centers.  The Vote Centers allow equal access to in-person voting on Election Day. (*Id*., ¶ 6).  Physical site assessments, required under Federal and State law, are done on each Vote Center before each election cycle, using the Department of Justice's required documentation, that can be found at: https://www.ada.gov/votingchecklist.htm. (*Id*., ¶ 7).

No pre-printed paper ballots are used at the seventeen (17) Vote Centers throughout the County because the specific ballot style can be accessed via the ExpressVote® machines.  (*Id*., ¶ 8).  Further, there are over 300-700 different ballot styles for each election, making it impossible and impracticable for the County to store paper copies of each ballot style at every one of its Vote Centers. (*Id*.)  The County does not have ballot on demand.  Nor does the County have any technology that would allow for specific, individualized ballots to be printed curbside. (*Id*., ¶ 9).  The County does not have the

WIFI or internet capability and/or capacity to have reliable and consistent ballot on demand at its seventeen (17) Vote Centers throughout the mostly rural County. (*Id.*, ¶ 10).

One additional technological challenge with offering curbside voting in the County is the use of the electronic e-pollbooks that are used to capture the voter's signature and that communicate with each other around the County.  These e-pollbooks cannot be disconnected from the Vote Centers' circuit to be taken curbside for the voter's signature because when it is disconnected from the system, the ***entire voting system*** shuts down and has to be restarted before voting can resume, which can take up to twenty (20) minutes. (*Id.*, ¶ 11).

In addition to the above-mentioned technical hurdles in providing curbside voting, curbside voting presents safety and liability concerns for the County and is no longer offered because of the potential for injury to voters, poll workers and the voting machine equipment.  (*Id.*, ¶ 12).  The touchscreen ExpressVote® machines are very heavy and contain very sensitive components.  Even though they are all on portable stands, they are not designed to be repeatedly moved in and out of the Vote Center facilities for curbside voting and tend to tip over, which could cause damage to a disabled voter's vehicle or serious injury to a disabled voter or to the poll worker moving the ExpressVote® machine. Simply stated, it is not safe for poll works to move these very top-heavy voting machines outside to a vehicle.  (*Id.*, ¶ 5).  Moreover, all of the County's ExpressVote® Machines are assigned to be used in the Vote Centers and there are no spare ones that can be left outside

for curbside voting. (*Id.*, ¶ 15).  Additionally, the ExpressVote® machines have limited battery life and need to be connected to an electrical supply. (*Id.*, ¶ 18).

To date, the County Elections department has had to have sixty-two (62) ExpressVote®® machines repaired under the County's maintenance agreement, which costs the County approximately $22,000 per year.  All of these repairs resulted from routine movement for delivery, placement and pickup for use on Election Day. (*Id.*, ¶ 16). Even though the PeakLogix CurbExpress ™ by ReadyVote® cart may be easier to move than the portable stands, the issue of the sensitive components remains unchanged. Repeatedly moving the ExpressVote® machines causes technical problems with the machines.  (*Id.*, ¶ 17).  Further, the carts will not always line up with the vehicles causing the disabled voter to get out of the vehicle to use the ExpressVote® machine. (*Id.*). Additionally, the fact remains that the vast majority of the County's poll workers are elderly and these elderly poll workers would still be required to physically move the ExpressVote® machines, repeatedly, in and out of the Vote Centers, creating the potential for the ExpressVote® machine and cart to tip over, damaging equipment and potentially injuring the poll worker and/or the voter.  (*Id.*)

All Vote Center poll workers are trained to provide assistance to disabled and elderly voters.  (*Id.*, ¶ 16).  Any voter requesting assistance is entitled to receive help and for those voters who have difficulty standing in line, although not entitled to advance to the front of the line, a poll worker will hold the voter's place in line and the voter can be offered a place to sit until it is his or her turn to vote.  There is no evidence that Plaintiff

ever asked any of the poll workers for this type of assistance as a reasonable modification. (*Id.*, ¶ 19).

Arizona law allows for, but does not mandate, curbside voting.   (*Id.*, ¶ 13). Additionally, Arizona law allows voters twenty-four (24) days of in-person voting prior to an election, as well as one day of emergency in-person voting prior to an election. Special Election Boards are also available on Election Day to assist voters at home, in hospitals or at assisted living facilities.   Curbside voting is not required during early in-person voting, nor is it required under emergency voting statutes.   (*Id.*, ¶ 14).

On May 3, 2018, the County issued a news release informing its residents that all of the County's Vote Centers met the needs of its disabled and elderly citizens because they were now fully ADA accessible and ADA compliant, and as a result, the County would no longer offer curbside voting.   (*Id.*, ¶ 20).   The information was also posted on the County's Facebook page and County website. (*Id.*, ¶ 21).   The news release also offered the County's residents other means to vote by using early ballots and registering to be on the Permanent Early Voting List ("PEVL").   (*Id.*, ¶ 22).   The County updated its poll worker's handbook and website, which both indicate that curbside voting is no longer offered. (*Id.*, ¶ 21).   The website and poll worker handbook also reflect information that was provided in the news release in 2018.   (*Id.*)   Since the implementation of the Vote Centers, the elimination of curbside voting, and over the course of eleven (11) Vote Center and nineteen (19) Vote by Mail elections and nearly 57,414 in-person voters, the County

has only received two (2) complaints or concerns, inclusive of Ms. Hoffard's complaint, about the elimination of curbside voting. (*Id.*, ¶ 23).

On January 7, 2019, Ms. Hoffard, through the Arizona Center for Disability Law, filed a discrimination claim with the Arizona Secretary of State, under the Help America Vote Act ("HAVA") of 2002, 52 U.S.C. §§ 21081, *et seq.*, alleging that Cochise County discriminated against her based on her disability, by refusing to provide curbside voting at two vote centers in Sierra Vista, Arizona.  (*Id.*, ¶ 24).  The two (2) Vote centers that Ms. Hoffard visited (VC-8, Shiloh Christian Ministries and VC-9, Methodist Church) on November 6, 2018, as outlined in her HAVA Complaint, are both fully ADA accessible and ADA compliant.  (*Id.*, ¶ 25).  Both Vote Centers had the required number of handicap (accessible) parking spaces under the ADA.  (*Id.*, ¶ 26).  Additionally, the rugs at the Vote Centers are not "small area rugs" or throw rugs like one would buy in a department store, but rather they are industrial, commercial rugs with non-slip rubber backing, designed to prevent slippage and falling, used in churches and similar facilities.  (*Id.*, ¶ 27).

On January 14, 2019, the Arizona Secretary of State denied Plaintiff's discrimination claim because it was procedurally deficient and notified the County's Election Director of Plaintiff's concerns.  (*Id.*, ¶ 28).  On February 4, 2019, the Elections Director wrote to Plaintiff about the concerns in her HAVA Complaint, explaining that the vote centers are ADA Compliant and fully ADA Accessible under the federal guidelines established for polling locations and therefore, curbside voting is no longer a requirement.  (*Id.*, ¶ 29).  Ms. Marra  further explained that because of the variety of

different ballot styles (approximately 300-700 ballot styles), there are no pre-printed paper ballots at the vote centers, any voter who chooses to vote in person is required to come to the ADA accessible Vote Center and cast his/her vote on one of the touchscreen ExpressVote® machines. Additionally, Ms. Marra offered Plaintiff the option of participating in early voting, requesting a paper ballot be mailed to her, and/or voting early, in-person at the Cochise County Recorder's Office. (*Id*., ¶ 30). Plaintiff never contacted Ms. Marra or responded to her letter. (*Id*., ¶ 31).

On May 4, 2019, Plaintiff filed a Complaint of Discrimination with the Arizona Attorney General's Office, Division of Civil Rights Section ("ACRD"). (*Id*., ¶ 32). On May 30, 2019, the County Attorney's Office on behalf of Defendants filed a position statement. (*Id*., ¶ 33). In January 2020, in response to ACRD's subpoena and discovery requests, Defendants produced over 500 pages of documents. (*Id*., ¶ 34). On May 4, 2020, ACRD closed its investigation, finding that "the information obtained [was] not sufficient to establish violations of the statutes and that further investigation is unlikely to produce such evidence" and issued a dismissal notice. (*Id*., ¶ 35). On information and belief, Plaintiff requested that ACRD reopen the case. However, ACRD did not reopen the case. (*Id*. ¶ 36).

On August 31, 2020, the Elections Director was served with Plaintiff's First Amended Complaint. (*Id*., ¶ 37).

## II. THE COURT SHOULD NOT ISSUE A PRELIMINARY INJUNCTION REQUIRING THE COUNTY TO OFFER CURBSIDE VOTING OR A SUBSTANTIALLY EQUIVALENT REASONABLE MODIFICATION AT ITS VOTE CENTERS FOR THE 2020 GENERAL ELECTION

A preliminary injunction is a powerful remedy used sparingly in cases with a set of extraordinary circumstances.  *Maxey v. Smith*, 823 F. Supp. 1321, 1327 (N.D. Miss. 1993). A mandatory injunction is an order that requires Defendants to act positively, rather than prohibiting certain conduct.  *Diamond House of SE Idaho, LLC v. City of Ammon*, 381 F. Supp. 3d 1262, 1270 (D. Idaho 2019), appeal dismissed, No. 19-35393, 2020 WL 2214373 (9th Cir. Apr. 16, 2020)(A mandatory injunction "orders a responsible party to take action.").  "A mandatory injunction 'goes well beyond simply maintaining the status quo,' requires a heightened burden of proof, and is 'particularly disfavored.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 879 (9th Cir. 2009) (*quoting Anderson v. U.S*., 612 F.2d 1112, 1114 (9th Cir. 1980))." *Id*., *see also United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1181 (3d Cir. 1976) (mandatory injunctions are generally disfavored by the courts and issued only in extraordinary circumstances to give the plaintiff relief.  The power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised).  "In general, mandatory injunctions 'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.' *Id*. (*quoting Anderson*, 612 F.2d at 1115)."

Plaintiff asks this Court to issue a mandatory injunction directing Defendants to perform a certain act – specifically, to offer curbside voting, or a reasonable modification, at its fully ADA accessible and ADA compliant Vote Centers for the November 2020 General Election.

Here, this Court should deny Plaintiff's motion for a mandatory injunction compelling the County to offer curbside voting, or a substantially equivalent reasonable modification, at its Vote Centers for the November 2020 General Election because Plaintiff cannot show that she is likely to succeed on the merits, that she has irreparable harm, an injunction is in the best interest of the public or that the balance of equities tips in her favor, as explained below:

**A.      Legal Standard**

"A preliminary injunction is an extraordinary remedy." *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir.1991). Federal law allows a preliminary injunction when the moving party establishes four factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury, (3) the threatened injury outweighs any damage that the injunction may cause the opposing party, and (4) the injunction will not disserve the public interest. *Id.* The party seeking injunction must clearly carry the burden of persuasion on all four requirements. *See Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir.2003). The grant of a preliminary injunction is treated as the exception rather than the rule. *Id.* at 364. The power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised. *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1181 (3d Cir. 1976). Here, Plaintiff cannot show a substantial likelihood of success on the merits. Nor, can she show irreparable harm. Nor, can she

show that issuing an injunction is in the public interest.  Nor, can she show that the balance of equities tips in her favor.

## B.    Plaintiff is Not Likely to Succeed on the Merits

### i.    Plaintiff Cannot Show That She Was Discriminated Against or Excluded from Participation in or Denied A Public Benefit

#### 1. All of the County's Vote Centers are fully ADA Compliant and ADA Accessible

For Plaintiff to show that she is likely to succeed on the merits, she needs to demonstrate that she was discriminated against, or excluded from participation in, or denied a public benefit due to her disability. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002). Specifically, Plaintiff needs to show that that the County does not or did not provide equal access to ***in-person*** voting on Election Day.  Showing this lack of service on the County's behalf is an important element of Plaintiff's *prima facie* case for discrimination under both the federal and state laws.  She cannot make such a showing.

Here, Plaintiff cannot show this element because all of the County's Vote Centers are fully ADA accessible and ADA Compliant.  Further all of the equipment utilized at the Vote Centers is fully ADA accessible.  *See* Marra Decl., ¶ 6.  State and Federal law prohibits discrimination in voting based on disability. This requires the County to make alternative means of voting available, but however, does not require the County to provide every conceivable means possible.  "A 'reasonable accommodation' is one that gives the otherwise qualified plaintiff with disabilities 'meaningful access' to the program or services sought. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir. 2003).  Further,

"[s]tates are not constitutionally mandated to make *special accommodations* for their disabled citizens. *See Garrett*, 121 S.Ct. at 964. Rather, States must refrain from irrational discrimination against the disabled." *Doe v. Div. of Youth & Family Servs*., 148 F. Supp. 2d 462, 488 (D.N.J. 2001) (emphasis added).   The County has not irrationally discriminated against Plaintiff.

Here, the two (2) Vote centers that Plaintiff visited (VC-8, Shiloh Christian Ministries and VC-9, Methodist Church) on November 6, 2018, are both fully ADA accessible and ADA compliant. *See* Marra Decl., ¶ 25).   Physical site assessments, required under Federal and State law, are done on each Vote Center before each election cycle, using the Department of Justice's required documentation.   Both Vote centers underwent the physical assessment. *See* Marra Decl., ¶¶ 7, 25.  Both of the Vote Centers had the required number of handicap (accessible) parking spaces under the ADA. *Id., ¶*26. Additionally, the rugs at the Vote Centers are not "small area rugs" or throw rugs like one would buy in a department store, but rather they are industrial, commercial rugs with non-slip rubber backing, designed to prevent slippage and falling, used in churches and similar facilities. *Id.*, 27.

Since the implementation of the Vote Centers, the elimination of curbside voting, and over the course of eleven (11) Vote Center and nineteen (19) Vote by Mail elections and nearly 57,414 in-person voters, the County has only received two (2) complaints or concerns, inclusive of Ms. Hoffard's complaint, about the elimination of curbside voting. *Id*., ¶ 23.

Cochise County ensures that individuals with disabilities are not discriminated against based on their disabilities by making sure that all of its Vote Centers are ADA accessible and ADA compliant.  These fully ADA accessible and ADA compliant Vote Centers provides individuals with disabilities equal access to ***in-person*** voting on Election day.  Consequently, Defendants did not discriminate against Plaintiff and Plaintiff is unlikely to succeed on the merits.  Consequently, this Court should deny Plaintiff's motion.

**2. State law does not require the County to offer curbside voting when it has fully ADA accessible and ADA compliant Vote Centers**.

In the 2019 Election Procedures Manual ("EPM"), which carries the force of law, and was specifically approved by the Arizona Attorney General, it specifies that curbside voting is an alternative voting option at vote centers ***only if*** available at the voting location and ***only when***: (1) no accessible sites are available; and (2) no temporary measures can make them accessible.  *See* 2019 Elections Procedures Manual, Chapter 5: Accommodating Voters with Disabilities, Section IV, Alternative Voting Options, pp. 105-106 (emphasis added).  The EPM further explains that it is the election director who determines if a voting location is not accessible.  *Id.*  Not the voter or anyone else.  The EPM also provides that curbside voting ***may*** be made available as a reasonable accommodation, but it does not mandate that it must be made available as a reasonable accommodation.

Here, Cochise County Elections Director, Lisa Marra determined that all of the County's 17 Vote Centers are ADA accessible and ADA compliant.  Therefore, under Arizona law, and pursuant to the EPM, the County was not legally obligated to offer curbside voting as a reasonable accommodation to Plaintiff.  Because Arizona law does not require the County to offer curbside voting Plaintiff cannot show that she was discriminated against or denied a benefit based on her disability.  Therefore, Plaintiff cannot show that she is substantially likely to succeed on the merits and this Court should dismiss Plaintiff's motion.

### 3.  The County offers alternatives for in-person voting.

The County has made reasonable accommodations to ensure voters with disabilities are not disenfranchised by also providing alternative ways to vote, including ***early in-person*** voting.  This provides full, equal and meaningful access to the voting process for everyone, which is ultimately the goal of anti-discrimination laws in voting.  Plaintiff demands that the County make special accommodations for her by insisting that the County offer her curbside voting – no matter what the cost – so that she may vote in-person on Election Day.  Plaintiff wants what she wants. Period.  The Vote Centers already provide her with a means of voting in-person on Election Day.  Additionally, the County has already provided a reasonable accommodation and reasonable modification as an alternative means for Plaintiff to vote in-person before Election day - specifically, at the Cochise County Recorder's Office or with assistance by poll works at the Vote Center on Election Day or through the use of Special Boards.  *See* Marra Decl. ¶¶ 14, 19, 30.  Plaintiff

puts too fine a point and too stringent a requirement on what it means for the County to provide individuals with disabilities meaningful and equal access the voting process.  The Constitution protects the right to vote, but not the right to vote in any manner one chooses.  *See Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Because these alternatives offer equal and meaningful access to voting, the County did not discriminate against Plaintiff based on disability.  Consequently, Plaintiff is unlikely to succeed on the merits and this Court should deny Plaintiff's motion.

> **4.    The Arizona Secretary of State Denied Plaintiff's HAVA Complaint and Attorney General's Office ("ACRD") Dismissed Plaintiff's Disability Discrimination Complaint**

Plaintiff is also unlikely to succeed on the merits because both the Arizona Secretary of State and the Arizona Attorney General's Office denied or dismissed Plaintiff's disability discrimination Complaint for procedural deficiencies and indicating that information and facts do not show any violation of law.

On January 7, 2019, Plaintiff, through the Arizona Center for Disability Law, filed a HAVA discrimination claim against the County with the Arizona Secretary of State, which was denied because it was procedurally deficient.  *Id.*, ¶¶ 24-28.  And, although the County's Elections Director attempted to reach out to Plaintiff to address her concerns, Plaintiff never responded.  *Id.*, ¶¶ 29-31.

On May 4, 2019, Ms. Plaintiff filed a Complaint of Discrimination with the Arizona Attorney General's Office, Division of Civil Rights Section ("ACRD").  *Id.*, ¶ 35.  After several months of investigation, on May 4, 2020, ACRD closed its investigation and

issued a dismissal notice finding that "the information obtained [was] not sufficient to establish violations of the statutes and that further investigation is unlikely to produce such evidence. On information and belief, Plaintiff requested that ACRD reopen the case. However, ACRD did not reopen the case. [1]  *Id.*, ¶¶ 35-36.  ACRD's dismissal of Plaintiff's disability complaint and unwillingness to reopen it is case indicates that Plaintiff is unlikely to succeed on the merits.  Because Plaintiff is unlikely to succeed on the merits, this Court should deny Plaintiff's motion.

### 5. The PeakLogix CurbExpress [TM] by ReadyVote® cart is not a reasonable modification

To prevail on her ADA claim, Plaintiff must propose a reasonable modification to the challenged public program that will allow her the meaningful access that she seeks. *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016).  A modification is reasonable if it is "reasonable on its face" or used "ordinarily or in the run of cases" and will not cause "undue hardship."  (*Id.*)

Here, Plaintiff proposes the use of as PeakLogix CurbExpress [TM] by ReadyVote® cart.  However, this alternative is not a **reasonable** alternative in the County because the County does not have the technology and consistent and reliable WIFI capacity to utilize these carts.  *See* Marra Decl., ¶¶ 8 – 11.  A mandatory injunction ordering the use of these

---

[1]      Pursuant to R10-3-106 Application for Reconsideration; Reopening of Proceedings, for ACRD to reopen the case, Plaintiff must include new evidence.  New evidence includes, but is not limited to, additional documentation and witnesses not previously disclosed or considered by ACRD during its investigation, new arguments, and/or other information concerning the complaint.  Defendants presume that Plaintiff had no new evidence to present to ACRD, as ACRD did not reopen its investigation.  Therefore, Plaintiff's claims of discrimination are presumably the same as those that were investigated by ACRD.

carts would create an undue burden on the County.  This is not a reasonable on its face.  Additionally, the carts do not eliminate the liability to the County for potential injury to the poll workers and voters and potential damage to the ExpressVote® machines.  If an ExpressVote® machine broke down due to moving it in and out fir curbside voting, that would delay voting and thus harm other voters who choose to vote at that Vote Center.

More specifically, the touchscreen ExpressVote® machines are very heavy and contain very sensitive components.  *Id.*, ¶ 15.  To date, The County Elections department had had to have sixty-two (62) ExpressVote® machines repaired under the County's maintenance agreement, which costs the County approximately $22,000 per year.  *Id.*, ¶ 16.  All of these repairs resulted from routine movement for delivery, placement and pickup for use on Election Day.  *Id.*  Should these sensitive machines be moved more frequently in and out of the seventeen (17) Vote Centers, the number of repairs will exponentially increase, thus creating an additional undue burden on the County.

The ExpressVote® machines also have limited battery life and need to be connected to an electrical supply.  *Id.*, ¶ 18.  Even though they are all on portable stands, they are not designed to be moved in and out of the Vote Center facilities repeatedly for curbside voting and tend to tip over, which could cause damage to a disabled voter's vehicle or serious injury to a disabled voter or to the poll worker moving the ExpressVote® machine, which is a liability exposure for the County.  *Id.*, ¶ 15.  Simply stated, it is not safe for poll works to move these very top-heavy voting machines outside to a vehicle.

Even though the PeakLogix CurbExpress TM by ReadyVote® cart may be easier to move than the portable stands, the issue of the sensitive components remains unchanged. Repeatedly moving the ExpressVote® machines causes technical problems with the machines. *Id*., ¶ 17. Further, the carts will not always line up with the vehicles causing the disabled voter to get out of the vehicle to use the ExpressVote® machine. Additionally, the fact remains that the vast majority of the County's poll workers are elderly and these elderly poll workers would still be required to physically move the ExpressVote® machines, repeatedly, in and out of the Vote centers, creating the potential for the ExpressVote® machine and cart to tip over, damaging equipment and potentially injuring the poll worker and/or the voter. *Id.*, ¶ 18. Consequently, Plaintiff's proposed use of these carts is not reasonable.

**6.   The County already offers a reasonable modification**.

The County already offers a reasonable modification to its policies, practices and procedures by providing other form of assistance at to the individuals with disabilities at its Vote Centers. All vote center poll workers are trained to provide assistance to disabled and elderly voters. Any voter requesting assistance is entitled to receive help and for those voters who have difficulty standing in line, although the voter is not entitled to advance to the front of the line, a poll worker will hold the voter's place in line and the voter can be offered a place to sit until it is his or her turn to vote. *See* Marra Decl*., ¶* 19. There is no evidence that Plaintiff ever asked any of the poll workers for this type of assistance as a reasonable modification. Plaintiff only asked for one method if voting – curbside.

Further, Arizona law allow voters twenty-four (24) days of in-person voting prior to an election, as well as one day of emergency in-person voting prior to an election. Special Election Boards are also available on Election Day to assist voters at home, in hospitals or at assisted living facilities.  *Id.,* ¶ 14.  Curbside voting in not required during early in-person voting, nor is it required under emergency voting statutes.  *Id*.

### 7.  Offering curbside voting would fundamentally alter the nature of the voting system in the County.

Reasonable modification is necessary to avoid discrimination based on disability, unless the public entity can demonstrate that making the modification would fundamentally alter the nature of the service, program or activity.  *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996).  Plaintiff proposes that: (1) the ExpressVote® machine be brought out to the voter's vehicle; (2) paper ballots be brought to the voter's vehicle; or (3) the county use ballot printers.  *See* Pl. Mot. for Preliminary Injunction, p. 16, 16:5-16:12.  However, here, the Court must deny curbside voting as a reasonable modification because Plaintiff's proposed options would fundamentally alter the nature of Cochise County's voting system, as describe directly below:

In 2015, Cochise County (the "County") decided to move to Vote Centers, rather than assigned polling centers/places, and made a significant monetary investment of over $1 million dollars in touchscreen ExpressVote® machines to utilize for voting at the Vote Centers.  *See* Marra Decl., ¶ 2.  The County has utilized Vote Centers for its statewide elections, starting in 2016.  *Id.,* ¶ 2.  No pre-printed paper ballots are used in at the seventeen (17) Vote Centers throughout the County because the specific ballot style can

21

be accessed via the ExpressVote® machines.  Further, there are over 300-700 different ballot styles for each election, making it impossible and impracticable for the County to store paper copies of each ballot style at every one of its Vote Centers.  *Id.*, ¶ 8.

Other Counties have ballot on demand, ballot printers and reliable WIFI or internet, which allows them offer curbside voting as a permissible, not mandatory, alternative. Cochise County does not.

The County does not have ballot on demand.  Nor does the County have any technology that would allow for specific, individualized ballots to be printed curbside. The County does not have the WIFI or internet capability and/or capacity to have reliable and consistent ballot on demand at its seventeen (17) Vote Centers throughout the mostly rural County. The electronic e-pollbooks used to capture a voter's signature cannot be disconnected from the Vote Centers' circuit to be taken curbside for the voter's signature because when it is disconnected from the system, the ***entire voting system*** shuts down and has to be restarted before voting can resume, which can take up to twenty (20) minutes. There is no way for the County to offer curbside voting under these circumstances without fundamentally altering its voting system, in which it has invested a significant amount of money.  Therefore, curbside voting in Cochise County is not a reasonable modification.

**8. The risk of contracting COVID-19 at a Vote Center can be reduced by using one of the alternative methods of voting**.

Plaintiff contends that "because of the predicted rise of COVID-19 in the coming months as we approach the General Election on November 3, 2020, she will be taking significant risk to enter the Vote Center to cast he ballot."  *See* Pl. Mot. for Preliminary

Injunction, p.16, 16:19-16:22, *see also* p.19, 19:6-19:18.  However, a more effective way of reducing risk to COVID-19 would be to use one of the alternative methods of voting provided by the County: (1) request an early ballot; (2) asked to ne placed on the Permanent Early Voting List ("PEVL"); (3) vote in-person at the County Recorder's Office; (4) drop off a ballot at one of the County's ballot drop off boxes throughout the County.  All American citizens have had to make adjustments and alter their usual ways of doing things during the COVID-19 pandemic.  One of these alternative methods of voting is lower risk for of contracting COVID-19 for any voter, and especially for any voter who may be vulnerable or at higher risk of contracting COVID-19.

### C.    Plaintiff Will Not Suffer Irreparable Harm in the Absence of an Injunction

The function and purpose of a preliminary injunction is to prevent irreparable injury pending an ultimate determination of the action.  *Marine Cooks & Stewards, AFL v. Panama S. S. Co.*, 268 F.2d 935, 935 (9th Cir. 1959).  Here, Plaintiff cannot establish that she has suffered irreparable harm because she did not.  By Plaintiff's own admission, she was able to cast her vote in the 2016 General Election at one of the County's Vote Centers.  *See* Pl. Mot. for Preliminary Injunction, p. 5, 5:21-24.  Therefore, she suffered no harm. Further, the County has not denied Plaintiff an opportunity to cast her vote.  She has many opportunities to do so, starting from the early voting period, right up until Election Day.

### D.     An Injunction is Not in the Public Interest

Plaintiff contends that issuing the injunction is in the public interest because curbside voting would promote the government interest in preventing the further spread of COVID-19.  However, the alternative methods of voting outlined above in Section II.B.i.8, better serve that interest, as the risk of contracting and spreading COVID-19 is lower, if one of those methods is used in lieu of visiting a Vote Center.

### E.     The Balance of Equities Does Not Tip in Plaintiff's Favor

To determine the balance of equities, the court must "balance the interest of all parties and weigh the damages to each."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).  Here, the balance of interest does not tip in Plaintiff's favor.  The County has protected Plaintiff's right to vote, has offered various alternative methods of voting, as well as reasonable modification of the County's policies, practices and procedures by allowing any voter with a disability who wishes to vote in-person on  Election Day to have a poll worker hold his/her place in line and sit in a chair until it is time for the voter to cast his/her vote on the ExpressVote® machines.

On the other hand, should a preliminary injunction issue, Defendants will be faced having to offer a service that fundamentally changes its voting system, which does not support a curbside voting process, as explained in Section II.B.i.7, above, and that will be extremely costly to implement.  The County does have ballot on demand.  Nor, does it have reliable and consistent WIFI capability and capacity.   The County will incur additional costs to repair the ExpressVote® machines that are damaged from being

24

repeatedly moved in and out of the Vote Centers.  The changes required to the County's system will be extensive and costly.  Here, the interest of the County is effectively running its voting system and administering the November 2020 General Election far outweighs Plaintiff's interest in having curbside voting, when there are many other alternative ways to vote.

## III.   THE COURT SHOULD REQUIRE THAT PLAINTIFF POST A BOND

The purpose of an injunction bond is not simply to protect the enjoined party from injury suffered because the trial court may have abused its discretion in granting a preliminary injunction, but to indemnify the enjoined party if ultimately it is held that that party had at all times the right to do the enjoined act.  *Wainwright Sec. Inc. v. Wall St. Transcript Corp.*, 80 F.R.D. 103, 107 (S.D.N.Y. 1978).  Here, if the mandatory preliminary injunction issue, Defendants' will incur costs to comply with the order.  Should the case proceed on the merits and Defendants prevail on the merits, Defendants will have suffered harm.  Therefore, Plaintiff this Court should require a bond from Plaintiff.

## IV.   CONCLUSION

For the reasons stated above, this Court should deny Plaintiff's Motion for Preliminary Injunction and Expedited Hearing and we respectfully ask this Court to do so.

/ / /

/ / /

/ / /

DATED this 19th day of October, 2020.

BRIAN M. MCINTYRE,
COCHISE COUNTY ATTORNEY

By:      /s/ Christine J. Roberts
         Christine J. Roberts
         Chief Civil Deputy County Attorney

A copy of the foregoing emailed
this 19th day of October, 2020, to:

Rose Daly-Rooney
rdalyrooney@azdisabilitylaw.org
Maya Abela
mabela@azdisabilitylaw.org
Tamaraingsey In
sun@azdisabilitylaw.org
Meaghan Kramer
mkramer@azdisabilitylaw.org